1

2

3                                                        **O**

4                                              NO JS-6

5

6

7

8                 UNITED STATES DISTRICT COURT

9                 CENTRAL DISTRICT OF CALIFORNIA

10

11  AVID LIFE MEDIA, INC., an      )  Case No. CV 12-09201 DDP (AJWx)
    Ontario corporation; AVID      )
12  DATING LIFE, INC., an          )
    Ontario corporation dba        )
13  ASHLEY MADISON adn             )
    ESTABLISHED MEN, INC., an      )  **ORDER GRANTING DEFENDANT'S MOTION**
14  Ontario corporation,           )  **TO DISMISS AND MOTION TO STRIKE**
                                    )  **IN PART AND DENYING IN PART AND**
15               Plaintiffs,       )  **GRANTING PLAINTIFFS' MOTION TO**
                                    )  **DISMISS FRAUD COUNTERCLAIM**
16       v.                        )
                                    )
17  INFOSTREAM GROUP, INC., dba    )
    SeekingArrangement.com and     )
18  WhatsYourPrice.com, et al.     )
                                    )
19               Defendants.       )  [Dkt Nos. 30, 42, 44]
    _____  )

20

21       Presently before the court are Defendant Infostream Group,

22  Inc. ("Infostream") and Lead Wey ("Wey")'s Motion to Dismiss and

23  Special Motion to Strike Plaintiffs' First Amended Complaint

24  ("FAC"), as well as Defendants' Motion to Dismiss Defendants' fraud

25  counterclaim.  Having considered the submissions of the parties and

26  heard oral argument, the court grants the motions in part and

27  denies in part, dismisses Plaintiffs' defamation claim and

28  Defendants' fraud counterclaim, and adopts the following order.

**I.   Background**

    A.   The parties

    Plaintiff Avid Dating Life, Inc., doing business as Ashley Madison, operates the online dating website www.ashleymadison.com. (FAC ¶ 4.)  Plaintiff Established Men,Inc. ("EMI") operates online dating websites, including www.establishedmen.com and www.arrangementfinders.com.  (<u>Id.</u> ¶ 5.) EMI formerly operated www.arrangementseekers.com.  (<u>Id.</u>)  Plaintiff Avid Life Media, Inc. (collectively with Ashley Madison and EMI,"Avid") owns both Ashley Madison and EMI.  (<u>Id.</u> ¶¶ 3-5.)

    Ashley Madison was launched in 2002; it is designed to facilitate discreet, extra-marital relationships in an online environment, with the possibility that the online relationship will mature into a physical meeting.  (<u>Id.</u> ¶ 18; Declaration of Noel Biderman in Opposition to the Motion to Strike ¶ 6; Declaration of Rizwan Jiwan in Opposition to the Motion to Strike ¶ 4.)  The website attracts approximately 72 million United States visitors each year.  (FAC ¶ 18.)  Avid claims that Ashley Madison has designed and developed, and is the owner of, a famous, non-functional trade dress to promote Ashley Madison on print, Internet, and billboard advertisements throughout the United States.  (<u>Id.</u> ¶¶ 19-21.)  Specifically, the trade dress depicts a woman with her finger press against her sealed lips (the "Shush Image") (<u>Id.</u> ¶ 20; Biderman Decl. ¶ 7; Jiwan Decl. ¶ 4.)  Avid claims that the Shush Image is inherently distinctive and has acquired secondary meaning, and that a substantial segment of the consuming public makes a mental association between the Shush Image and Ashley Madison.  (FAC ¶¶ 21, 23.)

1    EMI's online dating website, www.arrangementfinders.com, is

2    designed to facilitate men and women entering into mutually

3    beneficial "social arrangements." (Id. ¶ 25.)  Avid claims that

4    EMI has used the term "Arrangement Finders" as a source identifier

5    and as a trademark in connection with its services and website

6    since 2011.  (Id.)

7        Defendant Infostream Group, Inc. operates dating websites,

8    including seekingarrangement.com and whatsyourprice.com.  (Id. ¶6.)

9    Defendant Lead Wey, also known as, Brandon Wade, (collectively with

10   Infostream Group, "Infostream") is the founder and CEO of

11   Infostream Group.  (Id. at ¶ 7.)  Infostream owns the registered

12   trademarks "Seeking Arrangement" and "Mutually Beneficial

13   Relationships" in the United States and uses those marks in

14   connection with its services and websites.  (See Settlement

15   Agreement, Mot. to Dismiss, Ex. A.) Infostream launched

16   seekingarrangement.com in 2006 to promote "mutually beneficial

17   relationships" between members who are referred to as either sugar

18   daddies, sugar mommies, or sugar babies. (FAC ¶ 26.)  In 2011,

19   Infostream launched whatsyourprice.com, which allows its members to

20   buy and sell the opportunity of going out on a first date.  (Id.)

21       B.  Prior Litigation and the Settlement Agreement

22       In 2010, Infostream sued Avid in the United States District

23   Court for the Central District of California for, among other

24   things, trademark infringement, trademark dilution, and unfair

25   competition based on Avid's alleged use of Infostream's "Seeking

26   Arrangement"and "Mutually Beneficial Relationships" marks.  (See

27   generally No.CV 10-05166 VBF (FMO)).  Avid filed counterclaims for

28   cancellation of trademark and a separate actiona gainst Infostream

3

in Canada for breach of contract.  (SAC ¶ 40).  The parties
ultimately dismissed all claims against each other, pursuant to a
written settlement agreement (the "Agreement" or "Settlement
Agreement").

Under the Settlement Agreement, neither party admitted any
liability, obligation, misconduct, or wrongdoing of any kind in
connection with the underlying claims.  (Id. ¶ 10.)  The Settlement
Agreement further stated that the parties denied and contested the
claims and that the parties entered into the Settlement Agreement
"entirely as a compromise for the purpose of settlement of the
disputes . . . , to avoid the annoyance and expense of disputation
or litigation and to compromise, settle and extinguish all claims,
acts, damages, demands, rights of action and causes of action."
(Id.)

The Agreement provided that Avid would pay Infostream sixty
thousand dollars.  (Id. ¶ 2.)  Avid further agreed not to challenge
the validity of Infostream's "Seeking Arrangement" mark or the
"Mutually Beneficial Relationships" mark "so long as those marks
are used only within the 'Sugar Daddy' vertical market."  (Id. ¶
1.)  Avid also agreed to discontinue using the terms
"'ArrangementSeekers' (or an iteration or confusing similar
combination of the words 'arrangement' and 'seek') and 'Mutually
Beneficial Relationship' in any manner."  (Id. ¶ 2.)  Avid further
covenanted to transfer the domains "arrangementseekers.com"
and"arrangementseekers.net" to Infostream.  (Id. ¶ 2.)  The Parties
expressly agreed that "(1) the name 'Arrangement Finders' shall
serve as a suitable alternative which does not infringe upon the
Seeking Arrangement Mark; and (2) the term 'Mutually Beneficial

Arrangements' shall serve as a suitable alternative which does not infringe upon the Mutually Beneficial Relationships Mark." (_Id._)

Infostream, for its part, agreed to discontinue using "any of [Avid]'s Intellectual property including . . . brand images, trademarks (including, without limitation the Ashley Madison Mark .. . , Established Men, confusingly similar website layouts, and/or trade dress . . . ." (_Id._ ¶ 3.)

As defined by the Agreement, the term "using" was to have "the broadest interpretation possible," and included any commercial use of prohibited terms. "Using" also included, but was not limited to, imitating and copying prohibited terms, employing prohibited terms as meta-tags or in keyword stuffing, and advertising, e.g., through Google Adwords, with the prohibited terms. (_Id._ ¶ 4.) The Agreement included a further, catch-all definition of "using" as "engaging in any other activity constitution an infringement of the other Party's intellectual property rights." (_Id._ ¶ 4(f).) The Parties also mutually agreed to "cease and desist from making public disparaging comments about each other's businesses, reputations, websites or services" and not to "defame or imply negative information via internet, in person or [] through any other media and digital media means." (_Id._ ¶ 5.)

Avid maintains that the Settlement Agreement is confidential. (FAC ¶ 35.) The Settlement Agreement does not contain a confidentiality or non-disclosure provision, but does include preambulatory language stating, "THIS CONFIDENTIAL AGREEMENT (the"Agreement) is made" by and between Infostream and Av_Id._ (DE 44-1at 1.) In addition, the Settlement Agreement further states that "[t]he terms of the mutual release . . . shall not affect or

1  in any way alter the parties' rights, obligations, covenants,

2  promises or interests created under or pursuant to this Agreement

3  (including in particular, but without limitation, any obligation to

4  . . . keep confidential this Agreement or the terms thereof) . . .

5  ." (<u>Id.</u> ¶8.)

6      C.  Alleged Breaches

7      Avid alleges that Infostream breached the Settlement Agreement

8  by displaying Ashley Madison's trade dress, specifically the Shush

9  Image, on the seekingarrangement.com website, and by repeating and

10 publicizing that website through the press. (FAC ¶¶ 37, 38 and

11 Ex."B.")

12     Avid also alleges that Infostream breached the Settlement

13 Agreement by displaying and bidding on Avid's intellectual property

14 in internet advertising. (<u>Id.</u> ¶ 39.) For example, the FAC alleges

15 that a Google search for Avid's term "arrangementfinders" resulted

16 in the display of a paid advertisement for Infostream's

17 www.seekingarrangement.com website. (<u>Id.</u>) Avid alleges that the

18 use of Avid's "arrangement finders" intellectual property is likely

19 to create a false impression that seekingarrangement.com is

20 affiliated with Avid. (<u>Id.</u>)

21     The FAC further alleges that Infostream breached its

22 obligations under the Settlement Agreement by disclosing the terms

23 of the Settlement Agreement and making disparaging and negative

24 statements about Avid in a separate lawsuit against PayPal, Inc.

25 (<u>Id.</u> ¶¶ 40-43.) Avid alleges that Infostream falsely accused Avid

26 of running the same types of businesses as Infostream, engaging in

27 illegal conduct, forming an anti-competitive economic relationship

28 with PayPal, and facilitating antitrust violations. (<u>Id.</u> ¶¶

1    41-43.)  Avid also alleges that Infostream further breached the

2    Settlement Agreement by actively disseminating its statements and

3    implications made in the PayPal litigation to the press and other

4    non-participants in the PayPal litigation via the Internet, in

5    person, or through media or digital means.  (Id. ¶¶ 44-47.)

6        The FAC also alleges that Defendant Wey gave an interview,

7    subsequently posted online, in which he stated that "[Infostream]

8    ha[s] sued a huge company, Ashley Madison, in federal court for

9    infringing on our trademark.  The fact that we are building such a

10   brand implies that we need to protect it.  We are successful in

11   stopping them from using a website that was too similar to ours."

12   (Id. ¶ 51.)

13       Avid alleges that it gave notice to Infostream demanding that

14   Infostream cure the breach pursuant to paragraph 15 of the

15   Settlement Agreement.  Infostream did not respond to the demand.

16   (Id. ¶ 50.)  Avid then filed the instant action, which asserts

17   claims against Infostream for (1) breach of written contract,

18   (2)defamation, and (3) declaratory relief.  Infostream now moves to

19   dismiss, and to strike pursuant to California's Anti-SLAPP statute.

20   **II.  Legal Standard**

21       A complaint will survive a motion to dismiss when it

22   contains"sufficient factual matter, accepted as true, to state a

23   claim to relief that is plausible on its face." Ashcroft v. Iqbal,

24   556 U.S.662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550

25   U.S. 544,570 (2007)).  When considering a Rule 12(b)(6) motion, a

26   court must "accept as true all allegations of material fact and

27   must construe those facts in the light most favorable to the

28   plaintiff."  Resnick v. Hayes, 213 F.3d 443, 447 (9th Cir. 2000).

1   Although a complaint need not include "detailed factual

2   allegations," it must offer "more than an unadorned,

3   the-defendant-unlawfully-harmed-me accusation."  Iqbal, 556 U.S. at

4   678.  Conclusory allegations or allegations that are no more than a

5   statement of a legal conclusion "are not entitled to the assumption

6   of truth."  Id. at 679.  In other words, a pleading that merely

7   offers "labels and conclusions," a "formulaic recitation of the

8   elements," or "naked assertions" will not be sufficient to state a

9   claim upon which relief can be granted.   Id. at 678 (citations and

10  internal quotation marks omitted).

11       "When there are well-pleaded factual allegations, a court

12  should assume their veracity and then determine whether they

13  plausibly give rise to an entitlement of relief." Id. at 679.

14  Plaintiffs must allege "plausible grounds to infer" that their

15  claims rise "above the speculative level."  Twombly, 550 U.S. at

16  555.  "Determining whether a complaint states a plausible claim for

17  relief" is a "context-specific task that requires the reviewing

18  court to draw on its judicial experience and common sense."  Iqbal,

19  556 U.S. at 679.

20  **III. Discussion**

21       A.  Breach of Contract Claim

22            1.  Performance

23       The elements of a cause of action for breach of contract are

24  1) the existence of a contract, 2) plaintiff's performance or

25  excuse for nonperformance, 3) defendant's breach, and 4) damages.

26  Reichert v. Gen. Ins. Co. of Am., 68 Cal.2d 822, 830 (1968).  The

27  FAC alleges that Avid performed all conditions under the Agreement,

28  except those excused by Infostream's conduct.  (SAC ¶ 57.)

1  Infostream argues that Avid's averments of performance are

2  insufficient.  (Reply at 3.)

3      "[T]his court need not accept as true conclusory allegations

4  that are contradicted by documents referred to in the complaint."

5  Colony Cove Properties, LLC v. City of Carson, 640 F.3d 948, 955

6  (9th Cir. 2011).  Infostream points to a variety of documents that,

7  it argues, establish that Avid failed to perform its obligations

8  under the Agreements.  First, Infostream cites to Exhibits A and B

9  of the FAC.  Exhibits A and B are Avid's and Infostream's

10 respective uses of an image of a woman holding her index finger to

11 her pursed lips (i.e., the Shush Image).  The FAC alleges that the

12 Shush image is Avid's trade dress.  (FAC ¶ 20).

13      Rather than accept that allegation as true, Infostream argues

14 that it is the owner of the Shush Image trade dress.  (Mot. at 12.)

15 It is unclear to the court, however, how Exhibit B, which Avid

16 alleges to be Infostream's infringing use of the Shush Image,

17 contradicts Avid's allegation of trade dress ownership.  Infostream

18 attempts to bolster its argument by asking this court to take

19 judicial notice of a more or less identical image pulled from an

20 Infostream website in 2006.  The mere fact that an image was

21 displayed on a website at a certain time, however, cannot

22 conclusively establish ownership of the trade dress one way or

23 another.  While the disputed fact of ownership may or may not be

24 resolvable on summary judgment, it cannot be determined at this

25 stage.

26      Infostream also attempts to establish Avid's nonperformance by

27 requesting judicial notice of other documents.  Specifically,

28 Infostream asks that this court take notice of its own Second

9

1  Amended Complaint in a related case, No. CV 12-9315 (DDP), briefs

2  filed in that related case, and several screenshots of search

3  results taken from various websites at various times.  (RJN at

4  3-4.)

5      As an initial matter, arguments made by Avid's counsel in

6  support of a motion to dismiss in the related case, wherein Avid

7  was required to accept Infostream's allegations as true, do not

8  constitute admissions.  See Shiley, Inc. v. Bentley Labs., Inc.,

9  115 F.R.D. 169, 171 (C.D. Cal. 1987).  Furthermore, the search

10  engine results, which purportedly demonstrate Avid ads resulting

11  from a search for Infostream marks, do not necessarily establish

12  that Avid breached the Agreement by purchasing Infostream marks as

13  keywords.  In the absence of any documents clearly contradicting

14  Avid's allegations of performance, those allegations are entitled

15  to the presumption of truth.[1]

16          2.  Breach

17      Infostream further argues that the FAC fails to adequately

18  allege that Infostream breached the Settlement Agreement.

19              a.  Nondisparagement

20                  i.  The Paypal Litigation

21      In the Settlement Agreement, the parties agreed to "cease and

22  desist from making public disparaging comments about each other's

23  businesses, reputations, websites or services" and not to "defame

24  or imply negative information via internet, in person or [] through

25  any other media and digital media means."  The FAC alleges that

26  _____

27      [1] The court also notes that when asked whether the FAC alleges
    that Avid performed for at least some period subsequent to the
28  signing of the Agreement, Defendants' counsel responded that the
    answer involves an issue of fact.

1  Infostream breached this nondisparagement clause.  In a suit

2  against PayPal, to which Avid was not a party, Infostream alleged

3  in its pleadings that Avid, among other things, engaged in

4  anticompetitive behavior.  The FAC also alleges that Infostream

5  repeated comments suggesting that Avid facilitates prostitution,

6  that Infostream disseminated these disparaging statements to the

7  press in person, on the internet, and on the radio.  (FAC ¶¶ 40-46,

8  Opp. At 9.)

9      Infostream argues that its statements related to the PayPal

10  action are protected by the litigation privilege.  California's

11  litigation privilege applies to communications "(1) made in

12  judicial or quasi-judicial proceedings; (2) by litigants or other

13  participants authorized by law; (3) to achieve the objects of the

14  litigation; and (4) that have some connection or logical relation

15  to the action."  Wentland v. Wass, 126 Cal.App.4th 1484, 1490

16  (2005); Cal. Civil Code § 47(b).  While communications to news

17  media are not necessarily protected, publication of statements

18  outside the courtroom may be privileged to the extent they discuss

19  the pendency of the litigation.  See Epicor Sofware Corp. V.

20  Alternative Tech. Solutions, Inc., No. SACV 13-448-CJC, 2013 WL

21  3930545 at *5 (C.D. Cal. June 21, 2013).  Parties may, however,

22  waive the protections of the privilege by contract.  Wentland, 126

23  Cal.App.4th at 1494.

24      This is not to say that the privilege immunizes all

25  communication made in relation to litigation, nor that contractual

26  language will always trump the litigation privilege.  See Id.

27  ("The litigation privilege has never shielded one from all

28  liability."); T.T. ex rel. Susan T. v. County of Marin, No. C. 12-

1   2349 WHA, 2013 WL 308908 at *5 (N.D. Cal. Jan. 25, 2013) ("Where
2   the communication at issue is a separate promise independent of the
3   litigation . . . the litigation privilege may not apply."); Zopatti
4   v. Rancho Dorado Homeowners Assoc., No. 10CV1091 DMS, 2010 WL
5   5174534 at *3 (S.D. Cal. Dec. 15, 2010) (finding litigation
6   privilege inapplicable to breach of contract claim).  Rather,
7   "whether the litigation privilege applies to an action for breach
8   of contract turns on whether its application furthers the policies
9   underlying the privilege." Wentland, 126 Cal.App.4th at 1492.
10  These policies include the promotion of full and truthful
11  testimony, zealous advocacy, free access to the courts, and the
12  finality of judgments.  Id.
13      Here, to immunize Infostream's disparaging statements would not
14  further the policies underlying the litigation privilege.  The
15  language of the Settlement Agreement makes clear that the parties
16  intended it be comprehensive, releasing each other from all claims
17  "known and unknown, accrued or unaccrued, of every nature and kind
18  whatsover . . . arising from or in any way connected with any
19  events, facts, or circumstances . . . pertaining to those events,
20  facts or circumstances alleged (or which could have been alleged
21  in)" the prior litigation.  (Agreement at 4 ¶ 7.)  Nevertheless,
22  less than four months after entering into the Agreement, Infostream
23  proceeded to make disparaging remarks regarding alleged acts
24  committed by Avid prior to the Agreenent's recent execution.  To
25  insulate these statements with the litigation privilege would
26  render the Agreement largely meaningless, would ignore the
27  comprehensive language therein, and would hardly promote the
28  finality of the judgment resulting therefrom.  Further, Infostream

1   does not adequately explain how its explicit references to Avid
2   were necessary to or aided its efforts against PayPal.  Because
3   application of the litigation privilege here would frustrate rather
4   than further its underlying policies, Avid's breach of contract
5   claim is not barred.

6                        ii. The Wey Interview

7        In a seven-page interview posted to an internet website,
8   Defendant Lead Wey said, "[Infostream] ha[s] sued a huge company,
9   Ashley Madison, in federal court for infringing on our trademark.
10  The fact that we are building such a brand implies that we need to
11  protect it.  We are successful in stopping them from using a
12  website that was too similar to ours."  The FAC alleges that these
13  statements also constituted a breach of the Agreement's
14  non-disparagement provision.  (FAC ¶ 51.)  Though Infostream argues
15  that the FAC insufficiently pleads breach, it focuses its argument
16  on the statements related to the PayPal litigation, with no
17  discussion of Avid's allegations that Wey's interview statements
18  also constituted a breach of the Agreement.  Instead, Infostream
19  discusses Wey's statements in the context of Avid's Second Cause of
20  Action for defamation, discussed below.

21                        b.  Confidentiality

22       The FAC alleges that Infostream breached its confidentiality
23  obligations under the Agreement.  (FAC ¶ 60.)  Infostream's Motion
24  contends that the Agreement is not confidential, pointing to the
25  lack of any confidentiality provision.  Avid's opposition does not
26  address the confidentiality issue or oppose Infostream's motion to
27  dismiss the confidentiality claim.  Accordingly, Avid's claim for
28  breach of contract based on breach of confidentiality is dismissed.

c.  Use of Keywords

Infostream also argues that the FAC does not sufficiently allege breach based on Infostream's alleged use of Avid's intellectual property in keyword advertising.  (Mot. At 17.) Infostream argues that such claims must be supported by screenshots of advertisements appearing when users search for a protected mark. (Id.)  Infostream is mistaken.  While some plausible claim of consumer confusion is necessary to maintain a claim for trademark infringement, Avid brings no such claims here.  See Network Automation Inc. v. Advanced Sys. Concepts, Inc., 638 F.3d 1137,1153 (9th Cir. 2011).  Avid's claim for breach of the Agreement's non-use provisions is adequately pled.

d.  Trade Dress

Lastly, Infostream argues that Avid's breach of contract claim based on Infostream's alleged use of Avid's Shush Image trade dress must be dismissed because Infostream owns the trade dress.  As explained above, absent any documents conclusively contradicting Avid's ownership claim, this court must accept all of Avid's allegations as true.

For these reasons, Infostream's Motion to Dismiss the breach of contract claim is denied, in substantial part.  The motion is granted, however, with respect to Avid's claim based upon breach of confidentiality, which is dismissed.

B.  Defamation Claim

As described above, Wey gave an interview in which he stated, "[Infostream] ha[s] sued a huge company, Ashley Madison, in federal court for infringing on our trademark.  The fact that we are building such a brand implies that we need to protect it.  We were

14

1  successful in stopping them from using a website that was too

2  similar to ours."  Avid alleges that this statement is defamatory.

3      Defamation involves the intentional publication of a false,

4  unprivileged, injurious statement.  Smith v. Maldonado, 72

5  Cal.App.4th 637, 645 (1999).  Truth of the allegedly defamatory

6  statement is, therefore, a complete defense.  Harrel v. George, No.

7  CIV S-55-036 MCE DAD, 2012 WL 3647941 at *9 (E.D. Cal. Aug. 22,

8  2012).  "[I]t is sufficient if the defendant proves true the

9  substance of the charge, irrespective of slight inaccuracy in the

10  details, so long as the imputation is substantially true so as to

11  justify the gist or sting of the remark."  Id. (internal quotations

12  and citations omitted).  A statement is not substantially true,

13  however, if it would have a different effect on the mind of the

14  audience from that which the pleaded truth would have produced.

15  Masson v. New Yorker Magazine, Inc., 504 U.S. 496, 517 (1991);

16  Metabolife Int'l, Inc. v. Wornick, 264 F. 3d 832, 849 (9th Cir.

17  2001).

18      The FAC alleges that "Defendants were not successful in any

19  litigation with Ashley Madison for infringing Defendants' trademark

20  and Defendants were not successful in any litigation with Ashley

21  Madison by stopping Ashley Madison from 'using a website that was

22  too similar to' Defendants website."  (FAC ¶ 69.)  The crux of

23  Avid's defamation claim, therefore, is Wey's statement that, "We

24  were successful in stopping [Ashley Madison] from using a website

25  that was too similar to ours."

26      Avid argues that a true statement would have read something

27  like, "Infostream sued Avid Life Media, Ashley Madison, and EMI in

28  federal court for trademark infringement, and they settled the

15

1   lawsuit where the parties each received benefits and had

2   obligations.  Included in the settlement was the transfer of

3   certain domains from EMI."  (Opp. at 21.)  While Wey did not

4   explicitly mention the settlement, nor did he, as Avid would

5   suggest, state that Infostream was successful in its litigation

6   against Ashley Madison.  Rather, Wey stated that Infostream stopped

7   Ashley Madison from using a website similar to Infostream's.

8        Avid argues that Infostream only stopped EMI, not Ashley

9   Madison, from using a website.  (Opp. at 18.)  That

10  characterization, however, is not entirely accurate.  "Ashley

11  Madison" is the business name of Plaintiff Avid Dating Life, Inc.

12  The Settlement Agreement states that Avid Dating Life, Inc., Avid

13  Life Media Inc., and EMI may collectively be referred to as the

14  "Avid Parties."  Under the Agreement, the "Avid Parties," which

15  includes both EMI and Ashley Madison, agreed to assign all rights

16  to arrangementseekers.com and arrangementseekers.net to Infostream.

17  Thus, while the Agreement may not have stopped Ashley Madison from

18  using certain websites in the sense of forcing Ashley Madison to

19  cease current operations, it did prevent Ashley Madison from

20  prospectively using the websites at issue.  Under such

21  circumstances, any slight inaccuracies in Wey's statements

22  regarding the distinction between EMI and Ashley Madison did not

23  produce a different effect than a more precise statement would

24  have.  Because Wey's statement was substantially true, Avid's

25  defamation claim must be dismissed.

26       C.   Declaratory Judgment Claim

27       Because Avid's breach of contract claim will resolve all

28  claims regarding the contract and may provide Avid with the relief

                                16

1  it seeks with respect thereto, Avid's claim for a declaratory

2  judgment is dismissed.  See Streamcast Networks, Inc. v. IBIS LLC,

3  No. CV 05-4239 MMM, 2006 WL 5720345 at *3-4 (C.D. Cal. May 2,

4  2006).

5       D.   Anti-SLAPP

6       The court does not separately address the arguments raised

7  with respect to Defendants' anti-SLAPP Special Motion to Strike

8  because the outcome would be the same as under the Rule 12(b)(6)

9  analysis.  A motion to dismiss and an anti-SLAPP motion may be, but

10  are not necessarily, intertwined.  Hilton v. Hallmark Cards, 599

11  F.3d 894, 902 (9th Cir. 2010)l; See, e.g., Davis v. Electronic Arts

12  Inc., No. 10-3328 RS, 2012 WL 3860819 (N.D. Cal. Mar. 29, 2012).

13  Under California Code of Civil Procedure Section 425.16, a

14  defendant must first make a showing that the plaintiff's suit

15  arises from some protected activity.  Zamani v. Carnes, 491 F.3d

16  990, 994 (9th Cir. 2007).  Once defendant makes such a showing, the

17  burden shifts to the plaintiff to make a prima facie case that he

18  will prevail.  Id.

19       Here, the facts and arguments at issue in the two motions

20  overlap almost completely.  Even assuming that all of Avid's claims

21  arise from Infostream's protected activities, Avid has demonstrated

22  a likelihood of prevailing on the contract claim, but not on the

23  defamation claim, for the reasons stated above.

24       E.  Fraud Counterclaim

25       Infostream also brings a counterclaim for fraud against AvId.

26  Infostream alleges that in the course of the settlement

27  negotiations that ultimately led to the Agreement, Avid

28  misrepresented its earnings.  But for those misrepresentations,

1  Infostream alleges, Infostream would have required a larger

2  financial payment from Av<u>Id.</u>

3      As discussed above, the Agreement includes a mutual release

4  from "any and all claims . . ., known or unknown, accrued or

5  unaccrued, of every nature and kind whatsover, which they or any of

6  them ever had . . . or may in the future have . . . arising from or

7  in any way connected with any events . . . through the present . .

8  ." (Agreement ¶ 7.)  The parties also expressly agreed to waive

9  any undiscovered claims and any rights under California Civil Code

10 Section 1542, which otherwise excepts undiscovered claims from

11 general releases.  The Agreement further states that it "represents

12 the entire understanding of the parties with respect to its subject

13 matter and supersedes all previous representations," and that the

14 parties each "had the opportunity to seek the benefit of

15 independent legal counsel . . . regarding the substance of this

16 Agreement." (<u>Id.</u> ¶¶ 11, 19.)  Both parties were represented by

17 counsel.  (<u>Id.</u> ¶ 18.)

18      "The elements of a fraud claim are false representation,

19 knowledge of falsity, intent to defraud, justifiable reliance, and

20 damages." <u>City of Oceanside v. AELD, LLC</u>, 740 F.Supp.2d 1183, 1191

21 (S.D. Cal. 2010).  Avid argues that Infostream could not have

22 justifiably relied on any alleged misrepresentations regarding

23 Avid's earnings in light of the Agreement's specific language

24 superseding all prior representations and releasing Avid from all

25 claims of any nature whatsoever, including undiscovered claims.

26      This court agrees with Avid, and with those courts that have

27 held that express written language contradicting alleged oral

28 misrepresentations precludes a showing of justifiable reliance,

18

1   particularly where a reasonably diligent party could have

2   ascertained the truth.  See Omni Home Financing, Inc. v. Hartford

3   Life and Annuity Insurance Co., No. 06cv0921 IEG, 2008 WL 1985248

4   at *4-5 (S.D. Cal. Apr. 29, 2008).  This is particularly so where

5   the written provisions at issue are contained in a global

6   settlement agreement between sophisticated parties, which "cannot

7   reasonably be interpreted as leaving the door open to litigation

8   about the settlement negotiation process."  Facebook, Inc. v.

9   Pacific Northwest Software, Inc., 640 F.3d 1034, 140 (9th Cir.

10  2011); See also Facebook, Inc. v. ConnectU, Inc., No. C 07-1389 JW,

11  2008 WL 8820476 at *5 (N.D. Cal. June 25, 2008) ("Where a party is

12  represented by counsel, or where the alleged misrepresentation was

13  made by an adversary during the course of negotiations, courts have

14  held that reliance is unjustifiable."); Salehi v. Surfside III

15  Condominium Owners' Ass'n., 200 Cal.App.4th 1146, 1160 (2011).  In

16  light of the all-encompassing language of the Settlement Agreement,

17  which was drafted by counsel in the course of adversarial

18  litigation, Infostream cannot demonstrate justifiable reliance on

19  misrepresentations made during settlement negotiations.

20  Infostream's fraud counterclaim is dismissed with prejudice.

21  **IV.   Conclusion**

22       For the reasons stated above, Defendants' Motion to Dismiss

23  and Motion to Strike are GRANTED, in part, and DENIED, in part.

24  Plaintiffs' breach of contract claim is DISMISSED only with respect

25  ///

26  ///

27

28

to breach of confidentiality.  Plaintiffs' defamation claim,
however, is DISMISSED in its entirety, with prejudice.  Defendants'
fraud counterclaim is also DISMISSED with prejudice.


IT IS SO ORDERED.



Dated: November 12, 2013

                          DEAN D. PREGERSON
                          United States District Judge